Ruffin, Chief Justice.
 

 This bill was filed September 29th, 1831, and states, that in December, 1796, two grants were issued by this State to John Willis, late of Warren
 
 *253
 
 county, each for 2,500 acre's of land, situate in the Western District, now the State of Tennessee, on the fork of Deer River, and described by metes and bounds in the bill; and that Willis, for a valuable consideration, sold both of the tracts to William Falkener the elder, 1 ate of Warrenton, and, as the plaintiffs believe, executed a regular conveyance therefor; that, never having seen the deed nor any copy thereof, the plaintiffs are unable to state what was the amonnt of the consideration, but that, at the date of the conveyance, which they believe to be in 1798, Willis was indebted to said Falkener by bonds and on accounts in a large sum, amounting to upwards of $2,500, and that no part thereof has been discharged, except by a conveyance of said lands, and that Willis had no other means of satisfying the debt; and that Willis made, and Falkener received, the conveyance aforesaid, in satisfaction and discharge of his debt. The bill then further states, that William Falkener the elder, on the 20th day of October, 1798, conveyed the said two tracts of land to his son, William A. K. Falkener, in trust for the satisfaction of certain of his creditors, and also, by another deed of the same date, subject to the last mentioned- conveyance, did convey both of the said tracts to William, the son, and his heirs; which two conveyances, the plaintiffs charge, were made with the knowledge, consent and approbation of Willis, who attested the same as one of the subscribing witnesses thereto. The bill further states that sometime in that year-, 1798, William, the son, transmitted to the house of Smith and Rodman, composed of Willet Smith and Thomas Rodman, of Philadelphia, who were among the creditors of William the father and named in the trust deed, the said original grants, together with the conveyance of the said Willis, the deeds from William, his father, to himself, and a power of attorney from William, the son, authorizing Smith and Rod-man to sell the said two tracts of land, in order to assure them and the other creditors, -in the deed of trust mentioned, of the payment of their demands against the father; that no sale was ever made, because William the son paid all those demands, and that, after haying done so, he required the restitution of the papers; and that, in the year 1812, in pursu
 
 *254
 
 anee of said requisition, all were returned, except the deed of Willis and the power of attorney from William the son, but, instead of those, was sent a certificate of Willet Smith, one of the firm of Smith and Rodman, made before a notary public, and setting forth and declaring that the deed from John Willis to William Falkener and the said power of attorney had been lost. The bill then charges, that there can be no doubt but that Willis did make the conveyance as stated, for that, since the year 1798, he, Willis, never pretended but always disclaimed any interest in said lands, and in fact, in the year 1802, being utterly insolvent, took the oath of insolvency, and was duly discharged from imprisonment as an insolvent. The bill further states that, as the plaintiffs suppose, the deed was registered in Warren county, where it was made and the parties resided, but. that they have been unable to find the same either there or in Tennessee; and they aver that the book of the Register of Warren, containing the deeds registered between 1797 and 1802, has been destroyed by fire: And therefore the bill charges that both the deed and the registration thereof have been lost, so that neither can be produced. The bill then states the death of William Falkener, the son, in March, 1819, intestate, leaving the plaintiff, W. Falkener, and Sarah his two infant children and heirs at law; that Sarah, while an infant, intermarried with the other plaintiff, Henry L. Plummer, and the plaintiff William was still an infant at the filing of the bill; and that in the latter part of the year 1819, old Mr. Falkener, the grandfather of the plaintiffs, Sarah and William, also died; and that in 1806, John Willis died insolvent and intestate, leaving an only child, Elizabeth, now the wife of Geo. D. Baskerville, who are the defendants in this suit. The bill further states that Baskerville and wife have taken possession of the two tracts of land, claiming them as having descended from Willis to his said daughter; and that, for want of legal evidence of the conveyance from John Willis to the eldest Mr. Falkner, the plaintiffs are unable to bring an action at law' to recover the land. Whereupon the bill (after many minute interrogatories upon the matters charged in it, as to the knowledge, information or belief of the de
 
 *255
 
 fendants respectively,) proceeds to pray that the defendants should be decreed to surrender to the plaintiffs the possession of the lands, to execute to them a new conveyance in fee simple therefor, and to account for the profits.
 

 The defendants put in an answer, of which the material facts are as follows. The defendants admit the deaths of William Falkener, the father, and bf William, the son, at the times stated in the bill, and that the plaintiffs William and Sarah are the children and heirs of the latter, and of the ages stated in the bill. They also admit the insolvency of John Willis, that he took the oath of insolvency and died intestate, as charged in the bill; and the defendant Elizabeth is his only child and heir, and the wife of the other defendant; and they admit that the grants issued to John Willis, as charged. The answer then sets forth that the defendants do not admit, nor do they believe, that John Willis ever did sell the lands to William Falkener; nor do they admit or believe that Willis was indebted to said Falkener in any manner; that the defendants have no personal knowledge upon these subjects, and had not heard of the grants until, after the death of William the son, their existence and his possession of them became known, by their being found among his papers; and that their information touching these matters was derived principally from the late Governor James Turner, who died before the filing of this bill, and who was well acquainted with the Messrs. Falkeners and John Willis, resided for many years in the same village with them, and had every opportunity of acquiring a knowledge of their dealings, and married the widow of Willis and mother of Mrs. Baskerville. By him, shortly after the death of William A. K. Falkener, the defendants were informed that it was his, Governor Turner’s belief, founded on his personal knowledge of the dealings of Willis and William Falkener, the elder, that the former was not indebted to the latter, and, if said Falkener did receive the grants from Willis, it was not upon a sale to him, but for the purpose of raising money by a sale in Philadelphia, where Falkener was well known and Willis was an entire stranger, in order to carry on the operations of a gaming table, called A. B., with which Willis was in the habit of
 
 *256
 
 (ravelling about, for the benefit of himself and Falkener. The ' answer avers the belief of the defendants in the correctness of the foregoing information. The defendants further say, that they have, no knowledge of the genuineness gf the deeds from Falkener the father to his son; that the defendant George had seen one of them, which purported to be attested by John Willis, but whether in his proper hand-writing he is altogether ignorant, as he never saw said Willis, and has no knowledge of his writing; and they dp not, therefore, admit that the deeds were attested by Willis; or, if they were, that he was apprized of their contents; or that either of them .includes the lands described in the grants. The answer further states that the lands lie in what is called the Western District of Tennessee, to which the Indian title was extinguished a year or two before the death of William Falkener, the son, and that the price of lands in that part of the country, though before very low, became suddenly high and the lands much in demand; and that about that time, John C. McLemore, of Tennessee, a well known dealer in lands in the Western District, came to Warrenton to endeavor to purchase lands of that description, and enquired of said Falkener and of others in his presence, in regard to the o.wner .of the lands granted to said Willis, but the said Falkener made no reply, and did not intimate any claim to them. The answer further states that the
 
 Register’s Books of Warren county,
 
 from 1799 to 1803 were burnt, and not those from 1797. And the defendants say, that they were informed by Mrs. Turner, that she repeatedly understood from her first husband, the said Willis, in his life time, that he intended to convey his Western lands to his daughter Elizabeth; that the defendants have no knowledge that he did make such a conveyance; but that, if he did, it might have been and probably was registered in the book that was burnt; and that, as the same must have been made some years before he took the path of insolvency, the said Willis was enabled thereby with a clear conscience to relieve himself from confinement.
 

 There'was replication to the answer, and the parties proceeded to take proofs. As exhibits the plaintiffs deposited the grants to Willis, and also the deeds from old Mr. Falk
 
 *257
 
 ner to his son mentioned in the pleadings. Those deeds bear date the 28th of October, 1798, and purport to be witnessed by Thomas Gloster and John Willis, and were proved and registered in May, 1819, upon evidence of the hand-writing of the subscribing witnesses, both of whom were then dead. The first of those deeds assigns and conveys 22 slaves belonging to William the father, his remaining stock in trade, dwelling house and lot, all his cattle, horses and other stock, nine lots in Warrenton, all his household and kitchen furniture and plantation utensils, and bonds, book debts and other dues, and “likewise two tracts of land unto me belonging, Which are lying or situate in Cumberland or Davidson in the Western Territory, the particulars whereof I cannot describe, not having the plats now in my possession, together with every other kind of property, if any I have, not here enumerated;” upon trust to pay thereout certain debts due from William, the assignor, to Smith and Rodman oí Philadelphia, and other creditors mentioned to the amount of about $10,009: the second of those deeds, after reciting the former, conveys the same property, described in a schedule annexed, to the son for his own use and benefit, after satisfying the trusts in the previous deed declared; and in the schedule, the Tennessee land is mentioned thus, “likewise two tracts of land lying or situate in Cumberland or Davidson in the Western Territory.” And William, the son and assignee, thereby covenants that he will pay the debts owing at that time by his father “as well in conformity to the said deed of trust as to an original assignment bearing date the 5th of August 1797.”
 

 By the deposition of James Somerville, taken by the’plaintiffs, it appears that the witness was very intimate with the younger Falkener ior nine or ten years preceding his death, but had no recollection of having heard him talk much about his business; though he once heard him say he had valuable lands in the west, if he could get them. This witness took administration of the estate of W. Falkener, the son, at May court 1819; and states that, in examining his intestate’s papers, he found among them the grants and deeds above mentioned, or they were delivered to him by the élder
 
 *258
 
 as belonging to his deceased son, and that he immediately made it publicly known, that the grants were in his possesion, in order that it might be ascertained, whether the lands belonged to the heirs of Willis or the heirs of his intestate Falkener. This witness further states, that he found among his intestate’s papers the letters and documents hereafter mentioned, which he identifies; of which the genuineness is established by many other witnesses, so far as respects the hand-writing of the persons, whosé productions they purport to be. These documents are: First, a letter written from Philadelphia on the 16th of May, 1797, to William Falkener, the elder, by Smith and Rodman, in the following words: “ We have duly received your favor per Mr. Macon,
 
 with sundry papers enclosed respecting certain tracts of land,
 
 of the value of which you request us to make some enquiry here. We are entirely ignorant of this kind of property, and equally so with respect to the persons, who are most likely to purchase it: and having constantly endeavored to avoid all kind of land business, we hope you will pardon us if we decline appearing in this. From what we have been able to learn, however, there is no sale here for this kind of property.” The writer then proceeds to request a payment upon their demand against the other party.
 
 Secondly,
 
 another letter from Smith and Rodman to thesame person, dated ApriL 25th, 1798,asfollows: “Your circular letter of the llthinst.is received; the contents of which we have perused with concern, not onlyonourown account, butmuchupon yours. As we had been daily flattering ourselves with the hope of a remittance from you, our disappointment has been severe. If the step you have now taken was not to be avoided, it will be of little purpose to animadvert on our situation with you. As our disposition towards you has always been liberal, as we are deeply concerned in your ultimately discharging our debt; and above all, as we really have confidence in the uprightness of your intentions, we shall not hesitate to come into the measures you have proposed to your creditors, provided you will agree to make us secure as far as you have the power to do so. To this end we have to propose
 
 that you will take the trouble to have the enclosed powers of attorney
 
 
 *259
 
 (which you sent us last spring,) together with the signatures of the witnesses thereto, fully acknowledged before some proper authority, and transmit them to us thus proved, in order that we may hold the property in trust until you have discharged our debt; upon which we will immediately agree to any reasonable propositions, which will contribute to your accommodation.”
 

 Smith and Rodman afterwards instituted an action in the Circuit Court of the United States for their demand, in which Edward Graham, Esquire, of Newbern, was the plaintiffs’ attorney, and John Haywood, Esquire, of Franklin, the attorney of the defendant. On the 27th of July, 1802, William Falkener, the son, before judgment, paid to Mr. Graham bonds and cash to the amount of £693. 13. 6., Virginia currency, and the suit was dismissed. In the mean while Smith and Rodman had become bankrupt, and James Smith, Jun. and James Paul had been appointed their assignees. The third and fourth documents annexed to Mr. Somerville’s deposition, are two letters from John Haywood, Esq. to William Falkener. The one is dated January 11th, 1804, and is as follows: “ Please state your account since January, 1799, and the payments I have made. I will then add my account, and send it to you with the balance in money, either before I go or after I return from Newbern.
 
 1 shall try to remember your
 
 grants.” The word was first written
 
 deeds;
 
 but the pen was run through that and
 
 grants
 
 substituted. The other is without date and as follows: “ To my surprize both Mr. Graham and Mr. Wood say
 
 they have not nor have ever seen the
 
 5000
 
 acre grants.
 
 You had better write to the plaintiffs in the suit against you immediately.” The fifth is a letter to William, the younger, from James Smith & Son, written from Philadelphia and dated January 23d, 1806. Its words are: “In answer to your favor of the 15th instant, we inform you that in a small box, which we did not know had any thing in it,
 
 we found two patents for land in North Carolina, for
 
 2,500
 
 acres each in the name of John Willis,
 
 which appear as if they might have been lodged with Smith and Rodman as a security. If these are the papers you wish, you shall have them delivered to your or
 
 *260
 
 der, or we will inclose them to you, if you desire
 
 it,
 
 provided we are assure<^ °f the debt having been paid. The account remains open in the books; and as a number of orders were given to those, to whom they were indebted, which we know nothing about, you can perhaps inform us how this has been paid, and to whom.”
 

 The sixth of these documents is a letter from Mr. Graham, of Newbern, to William Falkener, the son, dated February 24th, 1806, in which he says: “Yours of the 18th inst. is received. I am glad to hear
 
 that you are in a fair way to regain possession of the title deposited with Smith and Rodman, as a security for what your father owed them.
 
 The inclosed will afford that assurance, which seems to be required as a pre-requisite to the surrender of the papers.” And therewith Mr. Graham sent a statement of the debt of William Falkener to Smith and Rodman, amounting to $693 13 6 Virginia currency, with his own receipt therefor as of July 27th, 1802.
 

 The next document is a letter of James Smith and Son to the same person, in the following words: “ Yours of the
 
 5th
 
 instant we have just received,
 
 and agreeable to your request, we noio enclose you the two patents,
 
 which we are sorry we did not know of, when personally applied to some time ago.” This letter is without date, but is postmarked “ Phila. March 12,” and the.postage is charged thereon “ 1 1-4 oz. $1:00;”
 

 The next in order is a letter from the same persons to the same, dated April 23rd, 1810, as follows: “ Willet Smith, of the house of Smith and Rodman, handed, me a letter, which you addressed to him on the subject of your father’s debt to that house, and
 
 with respect to some papers left in their hands as security.
 
 I was sometime ago appointed assignee, under the bankrupt law, of the estate of Smith and Rodman, and I cannot find that this sum, due by your father, has ever been paid. There is no credit on the books, and Willet says he has never received it, nor given any order for it. I wish you would be so obliging as to make enquiry of the attorney at Newbern, and know to whom he paid this money, if he ever paid it. I shall be glad to hear from you as soon as convenient; and in the meantime I have written to Willet Smith,
 
 *261
 
 who lives in New Jersey, to come to town and
 
 make search for the grants of land you speak of
 
 which I have been able to find among their papers.' If these cannot be found, you may depend upon my getting Wiilet to make the certificate you require and forward it.”
 

 '
 

 The next document is a certificate made by Wiilet Smith, before a Notary Public, December 23rd, 1812, as follows: “ This is to certify all whom it may concern, that William Falkener, of Warrenton, in North Carolina, about the year 1798, put into the hands of Smith and Rodman, of Philadelphia, merchants, two grants for land of 2,500 acres each, accompanied with a bill of sale from John Willis to said Falkener for said land, and a power of attorney from said Falkener to Smith and Rodman, authorising them to dispose of said land; that some years after that transaction, the said grants of land were returned to the said William Falkener, but that the bill of sale from Willis to Falkener, and his power of attorney to Smith and Rodman, could not then be found, nor have they ever been able to find the same, they being mislaid or lost.”
 

 The next and last document produced by this witness, on this part of the case, purports to be a draft of a letter, found among the papers of William Falkener, the son, from him to James Smith, Jr., dated January 25th, 1819, in which he says: !t You informed me that if Mr. Wiilet Smith could find the deeds made to my father by John Willis, and the power of attorney from the former to Smith and Rodman, they should be forwarded to me. in the hope that they may be found, and that from my long silence you may have thought they were not wanted, I again write, requesting that should that be the case, they may be forwarded. If not found, I earnestly entreat that all the papers may be particularly examined. It is of great consequence to me to find those deeds from Willis to Mr. Falkener, and any expense or trouble, which you or Mr. W. Smith may be at, I will cheerfully pay.”
 

 The witness Mr. Somerville also states that among his intestate’s papers he found an account in the hand-writing of his intestate, in the following form:
 

 
 *262
 

 “
 
 Mr. John Willis
 

 To William Falkener Dr.
 

 £. s.
 
 d.
 

 1801, September 30th. To balance of account and interest with T. B. G. & Co. 174 10
 
 2l
 

 Account with Wm. Falkener, 335 11 24
 

 Account with Wm. Falkener, Jr., 27 11 Ilf
 

 Account do 42 2 24
 

 Bonds and interest,
 
 150
 
 2 11
 

 Tavern account, 15 10 11
 

 Virginia Currency, £745 12 5”
 

 Or.”
 

 And that, accompanying the same were, in the hand-writing of the said William the younger, the accounts mentioned in the foregoing summary, drawn out at large. They purport to be open accounts for dealings by John Willis, as a customer in the respective stores of Thomas B. Gloster and Company, William Falkener, and William Falkener, the younger. That of Thomas B. Gloster & Co. began April 25th, 1793, and continued down to May 8th, 1795, and amounted to £119 6 6¾ principal money, which, with the sum of £55 3 7¾ for interest computed to September 1801, made the above sum of £174 10 24. That of William Falkener the elder began May 15th, 1795, and continued to January 8th, 1799, and amounted to £274 6 8, which, with $61 7 6? computed for interest to September, 1801, made the sum of £335 14 24. Those of William Falkener, Jun’r. began April 29th, 1799, and continued to July 17th, 1800, and, with the interest thereon, computed also to September, 1801, amounted to the sums mentioned in the above general account. The item of “Bonds and interest” consisted of bonds given by Willis to Thomas B. Gloster & Co. for money lent in October, 1794, and March, 1795, and to other persons which appear to have been assigned to or taken up by the one or the other of the Messrs. Falkener, and on them interest was also computed to September, 1801. On' the general statement,
 
 below
 
 the debits the word “ Cr.” is written, but no credit is set forth; and on the other several accounts men-;
 
 *263
 
 tioned, there is no credit given for the price of this or any land, or indeed for any thing, except for the small sum of £1 5 3, paid in cash, January 5th, 1795. The firm of Thomas B. Gloster & Co. consisted of Gloster and the elder Mr. Falkener, and did business up to about May, 1795, when Gloster retired, and Falkener took the whole to himself.
 

 The same witness also produces an account between William Falkener and one William Christmas, who was a resident of Tennessee, and appears to have been the agent of Falkener as to some lands claimed by him in that State. In the account Christmas charges Falkener with the following items:
 

 $
 

 “ To cash paid for recording a deed in Tennessee, 1 35
 

 To cash paid for your land tax in Tennessee for the year 1799,. 6 04”
 

 On this account Christmas gave a receipt in full, dated March 31st. 1801; and at the same time he gave a receipt for $20, put into his hands to pay Falkener’s land taxes in Tennessee.
 

 Next follows a letter from the same William Christmas to William Falkener, and likewise found and produced by Mr. Somerville, dated Nashville, July 10th, 1802. In that letter, the following passage's occur: “I received yours by Col. C., and several others at different times. In answer to your former dates, I have twice written by post, which I expect have miscarried. I now inform you, your landed interest in this county stands in an ugly point of view. One thousand acres of your land only was advertised for sale for the Federal tax. Col. Overton advised me to let it be sold, as you had no deed recorded in this country and that I should become the purchaser, and then let it be sold for the State tax and again become the purchaser and relinquish to you; and by these means he thought the title might be good in you. I took his counsel and did purchase, though only 100 acres was sold, which satisfied the tax. I now relinquish to you the aforesaid land I have purchased or may purchase, while I have money belonging to you in my hands. I have yet between $12 and $15, nearly enough for two year’s taxes.
 
 *264
 
 J have not the courses of your land, and, as there is no re' cord here, I cannot say what it is worth, as I do not know the land.
 
 1 once brought to this country a deed of yours, an^"> as ^ could n°t be recorded here for want of the necessary proof, 1 returned it to you again and did not keep a copy. You will therefore please send me the courses of each tract, by which I likely may ascertain the land and nearly its value.”
 

 The foregoing documents were all read upon the hearing; but upon an understanding between the counsel, that they were read subject to all just exceptions; and in the argument, the counsel for the defendants insisted, that they were not evidence against the defendants, but, as coming from the ancestor of the plaintiffs, they were evidence against the plaintiffs.
 

 By the depositions of several persons, resident in the village of Warrenton from the year 1790 to the bringing of this suit, and well acquainted with John Willis and the elder and younger Falkener, it is established that Willis was an imprudent, dissipated and intemperate roan, and
 
 lost his
 
 credit early in life, and as soon as 1798, and became insolvent. Gloster married his sister; and there was a close and intimate friendship between Willis and the elder Mr. Falkener, who was very kind to Willi's, and let him have necessary articles from his stores, when no other merchant would; but to what amount, the witnesses could form no opinion, except the late Judge Hall, who stated that he was under the impression each of those persons had told him, it was to no great extent. That gentleman also states that at the time of this transaction, as alleged, land in the Western District, to which the Indian title was not extinguished, was of very inconsiderable value; and that he did not recollect to have heard either of the Mr. Falkeners set up any claim to these lands.
 

 But two witnesses, Richard Davidson and John G. Johnson, oí whom the latter was' the brother-in-law and one of the administrators of William the son, state that they were particularly intimate with William Falkener for many years before his death, and conversed freely with him upon the
 
 *265
 
 subject of his property, and often heard him say that he had lands in Tennessee, which his father purchased from John Willis; $:it that he had’ a difficulty in getting the title pa-pars, and had sent to Philadelphia to procure them; that he always spoke of the conveyance from Willis as an absolute conveyance to his father in consideration of debts due from Willis to his father; and never spoke of it in any other way, sor of having any other lands in Tennessee.
 

 Robert Park, another witness for the plaintiffs, and a brother-in-law of Willis, to an interrogatory on the part of the plaintiffs, “Did you hear Mr. Willis for many years before his death speak of the land in controversy, and particularly that he had conveyed to any and what person?” answers, “ I have heard him say he had land in the western country. I do not recollect that I ever heard him say, he had conveyed it to any person. I do not recollect thé time I heard him speak of his western land. I had very little intercourse with him before his death. We were as friendly as brothers-in-law usually are for three or four years after his marriage with my sister, which I believe was about 1793.” To an interrogatory on the part of the defendant, “ whether about the period John Willis took the insolvent debtor’s oath and for some time before, the fóculties of his mind, and particularly his recollection, and his capacity for business, were not greatly impaired by his genéral habits and course of life?” the witness answers “I cannot say with any degree of certainty how long before his death his mind had become impaired; but it was á considerable time, I believe several years, before his death, that he was incapacitated for business from insanity, a situation brought on by intemperance in drinking. I do not recollect that, at the time he took the oath of insolvency, he was or was not considered insane; but he was habitually intemperate a considérable’time before' that.”
 

 William Person states that he'procured the warrants' and' grants for Willis, and was intimately acquainted with him and William Falkener, the elder, ánd never heard either of them speak of Willis having conveyed the lands to i alkener. He never heard the latter speak of the lands at all. He, thé'
 
 *266
 
 witness, applied to Willis to purchase the lands, but Willis re^use(^ an<^ gave as a reason that he had placed them in the hands of William Falkener, Sen’r.,,to sell for him in the Philadelphia market. He further states that John Willis became insane, the insanity being brought on by dissipation.
 
 “
 
 I do not recollect at what time it became apparent, but it was several years before his death; three or four years, as I believe, fully three. His habits of intemperance were of long standing. When he took the oath of insolvency, and for a short time before, he was incapable of business, as I believe from personal transactions and conversations with him.” To the question on the part of the plaintiffs, “ whether he had not capacity to remember, when required to render a schedule of his property, that he owned 5000 acres of -land,” the witness answers, tf I believe that at the time he had no mind at all, or was in a state o'f insanity. It immediately preceded his confinement for insanity, I think.”
 

 Jacob Mordecaf states that, as a merchant at Warrenton, he had dealings with John Willis from 1791 to 1804; that his credit was always slender, but was a little better after his marriage with Miss Park, until 1797, when he failed and was deemed unworthy of credit, though considered honest. Until 1804, witness was in the habit of seeing Willis almost daily, and thought him generally to be in his perfect senses. The witness, as a Justice of the Peace, in conjunction with another magistrate, administered the oath of insolvency to him in March, 1802, and discharged him, and he was then both sane and sober, as the witness thought. In 1804 he became notoriously insane and was confined until his death. To the question on the part of the defendants, “ Do you not believe that, during the above period, there were times at which he, Willis, was not in his proper mind?” the witness replies: “ During the whole period of my acquaintance with John Willis, he was of a reckless, frolicsome, jovial disposition.- After the withdrawal of his wife from him, which was a few years before his attack of lunacy, he became very intemperate; and I have no doubt his mind was at times, when under the influence of liquor, as much or more deranged- than men of his habits usually are.”
 

 
 *267
 
 Philip C. Pope states that, atoóme time between the years 1813 and 1819, John C. McLemore, of Tennessee, came to Warrenton and asked the witness and William Falkener, the younger, if they knew any thing in relation to the lands supposed to belong to John Willis in Tennessee; to which the witness replied, that he did not, though he would be glad to know, as he had married a grand-daughter of the elder John Willis, and might be interested in them: But Mr. Falkener made no reply whatever.
 

 The late Mr. Grundy, of Tennessee, states that the lands in controversy were within the Indian Territory, until the year 1818; that no State tax was imposed on them until 1819; and no tax by the United States at any time.
 

 Thomas Rodman died about 1829 or 1830, in Philadelphia; but had spent much of his time after his bankruptcy, in India.
 

 Willet Smith died in July, 1839, in Camden, in New Jersey, in which State he had generally resided after his failure. The year before his death the plaintiffs gave notice to take his deposition in Philadelphia; but he did not attend; and notice was again given to take it at a place in New Jersey, but without its being taken.
 

 James Smith, Jun’r., one of the assignees of Smith and Rodman, died in Philadelphia in 1834 or 5; and James Paul, the other assignee, died in May, 1839. In the latter part of 1839 the sons of those two persons thoroughly examined their papers for deeds from Willis to Falkener, and for the letter books of Smith and Rodman, but could find no such documents.
 

 The perusal of the pleadings and proofs in this cause cannot well fail to produce the impression, that, if the plaintiffs do not succeed, it will not be so much from the injustice of their demands being established, as from' the defect of that kind and extent of proof, which authorises the Court affirmátively to declare its justice and enforce it.
 

 The bill is founded on the allegation of an executed ábsolute conveyance, constituting a legal title with the exception of the ceremony of registration, and lost; so that it cannot be
 
 *268
 
 set up for the want of registration. The object of the bill is to be relieved from loss by that accident, by requiring the defendant, as the heir of the person who made the lost deed, not to take advantage of that accident, but to execute another. The equity cannot be denied, if the facts, on which it is founded, fee established. There should be a decree for the plaintiffs without regard to the consideration, provided it was such as would render the d.eed effectual in law; for the jurisdiction is, simply, to set tip a legal conveyance, which was good in itself and has been lost,
 
 and the
 
 enquiries are confined to the points of its existence, legal operation, and loss.
 
 Tolar
 
 vs. Tolar, 1 Dev. Eq. 456.
 

 It may at once be stated .that sufficient enquiry appears to have been made for this instrument, if it ever existed, to authorise the declaration of its loss. Still it is incumbent on the plaintiffs to shew its existence at one time and its contents. At law the existence of an instrument as .a genuine one is shewn by proving its execution according to the nature of the instrument, that is to say, by the subscribing witness, if there be one, or by proof of hand-writing. This is ordinarily true in Equity also.
 
 Goodies
 
 vs. Lake, I Atk. 246. It cannot be otherwise; for in reason as well as in law, things which do not appear must be regarded as if they did not exist. After it be thus shewn that the instrument existed, its operation and effect may be established
 
 by
 
 provingthe contents by the best evidence in the party’s power; such as an examined copy, the registry of it or the oral testimony of witnesses, who can state the contents, or the admission of its contents by the person executing it. But in this case all those ordinary proofs are wanting. There is no evidence of execution coming from a subscribing witness; there is no evidence of any witness, who ever saw such a paper as that stated in the bill, much less that it was attested by any particular person, and that the witness knew the signature either of John Willis or of the attesting witness. Nor indeed has any witness been examined, who states more upon this point, than that he had heard either from the elder or the younger Mr. Falkner, that Willjs had made a deed for this land in discharge of the debt he owed Falkner, but without
 
 *269
 
 any further particulars as to price or a witness cognizant of any treaty .of purchase or attesting the conveyance. It is obvious that the plaintiffs have alleged, and therefore undertake to establish, a case difficult of proof, even under favorable circumstances and where the facts are recent; and the difficulty of making satisfactory proof becomes extreme, after the lapse of forty years and the death of the parties and of nearly all their neighbors and friends, who might and probably would have knowledge on the subject of controversy. It was said in the argument that such disadvantages naturally lead to defects in the proofs, and therefore that these ought not to be as fatal, as if they grew out of a transaction, to which more direct or full proof would be in the party’s power. The inference drawn was, that the Court ought in such a case to be satisfied with less proof of the truth of the ancient alleged facts. To that inference we cannot yield our assent. The modes of proof may be different; but they must be equally satisfactory to the mind. There are, for example, old transactions, of which the law dispenses with direct proof on account of their age, and in place of proof puts up with presumptions. Thus, instead of the production of a conveyance by one, who has been a very long time in possession of land, not acknowledging to hold finder the former owner but openly claiming and treating it as his own, the law presumes a conveyance to the possessor and its loss. But here there is no possession of the land. It is true there could be none, for the Indians occupied the territory. The want of possession is, indeed, not evidence in this case that such a deed was not made. But the plaintiffs have to shew affirmatively that it was made, and long possession is stringent proof of the . conveyance. That there was no possession, then, from whatever cause it may have arisen, does deprive the plaintiffs of the benefit of possession, as affirmative evidence of such conveyance to their ancestor. In the case too of a deed thirty years old, proof of execution is dispensed with. But it is the generally received opinion, that, to render such a deed admissible, there must be some account of its proper custody, and also evidence that the party has been in possession under it; for it is the accompanying possession-of the
 
 *270
 
 land that establishes the authenticity of an ancient deed.
 
 Jackson
 
 vs.
 
 Blanshaw,
 
 3 John. Rep. 292. At all events the rule applies only to a produced deed, of which the proof of execut^on *s dispensed with, on the presumption that the attesting witnesses are dead. 1 Stark. Ev. 330. It has no application to the doctrines of presuming or proving the existence of deeds. In this case, therefore, there are none of the common grounds for dispensing with proof oí the execution of an ancient deed, or for presuming a deed, further than its existence may be established by direct or circumstantial evidence, satisfying the mind of the very fact in the same manner as such evidence would be demanded upon any other question. The presumption from lapse of time is, then, really against the plaintiffs; because, in the nature of things, the truth is likely to be obscured, the facts forgotten and material witnesses dead, and the Court misled by specious appearances^ all in proportion to the longer or shorter time, intervening between the happening of a transaction and the investigation of its existence and consideration and purpose. As the plaintiffs come late to establish their case, it may be true that they cannot do it as clearly as they once could. That is their misfortune. But still the Court must have proper and full proof, such as will produce the conviction that, long ago as it is said this deed was executed, yet in-fact it was then executed, and was an
 
 absolute
 
 conveyance. The cause depends upon the enquiry whether such proof is found in this case.
 

 Aware of the great deficiency of the usual and requisite proofs given of an instrument, which the party alleges to have been lost and seeks to supply, the draftsman of the bill, after stating the existence of the deed, proceeds to admit and account for deficiency of that kind of evidence, and endeavors to substitute evidence of a different kind, as tending to establish its existence. It is stated that the plaintiffs cannot prove the execution of the deed, nor produce a copy of it, nor shew the consideration stated, nor its contents in particular. But it is charged that Willis was indebted to Falkener to more than the value of the land, and was not able to pay, and never did pay the debt, except as the price of this
 
 *271
 
 land; and that the land was purchased by taking it in faction of the debts. The bill then states “that there can be no doubt that Willis did make the conveyance,” and that for several reasons: that Mr. Falkener had possession of the grant, and conveyed the land with the privity of Willis, who attested the deeds; and that Mr. Falkener, the son, also claimed it up to his death, and was for many years in search of the deed from Willis, as that under which he claimed; that the title papers had been deposited with the house of Smith and Rodman, of Philadelphia, for the security of a debt, and that they declared this deed was lost; that the registry of the deed was burnt, which prevents the production of a copy; and that Willis did not claim the land after 1798, and that in 1802 he in the most solemn manner disclaimed it by taking the oath of insolvency.
 

 Upon the allegation that the Register’s book between 1797 and 1802 was burnt, the plaintiffs have offered*no evidence; and according to the answer, the book destroyed was that from 1799 to 1803. This circumstance is therefore out of the case; and it must be taken that there was no registry of s,uch an instrument, inasmuch as in May, 1797, this deed, according to the plaintiffs’ allegation, was in Philadelphia, and never got back.
 

 Although no witness professes to be sufficiently acquainted with Willis’s hand-writing to form a judgment satisfactory to himself, whether the signature as an attesting witness to the deeds from Mr. Falkener to'his son, be that of Willis or not, yet our opinion does not proceed on that, and the case may be treated upon the admission that he is the witness. Formerly privity was imputed to an attesting witness. Men may have been much more particular in those days than in ours as to the subject matter of deeeds' witnessed by them; and if witnesses generally were in the habit of ascertaining the contents of a deed before attesting it, there might be some reason to infer the fact against all. But in practice few persons ask, much less peruse for themselves, to learn the provisions of the instruments they are about to attest. There is therefore no just inference, in fact, of the knowledge of the contents; and now there is no such legal presumption.
 
 *272
 
 Sug-. Yen. 547. But the terms of these, deeds would have a®3r^ec^ Willis no certain information Upon the point.— There are no metes nor bounds, no reference to the conveyanCe °r Person un^er whom he claimed, not even the river mentioned on which the lands lie,- nor the number of acres. There is nothing in the description to identify the particular land; and if Falkener had c'lalméd no other land in Tennessee, still Willis had no means of knowing that, or that the lands meant were granted to himself. But there is evidence, which will be more particularly considered,- subsequently, that Falkener had deeds for two óth'er tracts of land in that State; and, consequently, that it ought nof to be inferred that Willis supposed his lands the subjects of the deeds he witnessed'.
 

 With respde’t to' the indebtedness of Willis to Falkener, it is to be observed, that there is no legal evidence thereof, except as to the bonds and notes for £150
 
 2
 
 11. Theac-’ counts are unsupported by a'ñy pró'of of the delivery of the articles. The only evidence is the stateménf óf Mr. Somerville, that the accounts, as stated, are
 
 in the hand-writing
 
 of the younger Mr. Falkener, and were found among his papers. It does nót even appear that these accounts have been compared with the original entries in the books,'dll ot which were iti
 
 that gentleman’s possession:
 
 Besides' that, there is the testimony of several persons of the
 
 village that
 
 Willis had dealings in the stores; but to' what amount no one intimates except Judge Hall, who says he' was told by Willis and Falkener both “that it was to no great extent.” To so material a part of the plaintiffs’ ease, the proof is, therefore, far from satisfactory. But let it be admitted that here it is. sufficient to shew dealings and some indebtedness, and that the evidence goes to that extent. Yet there are several things connected with these accounts as stated, that seem irreconcileable vyith the supposed conveyance, made, if at all, between December,' 1796, and May, 1797. The inference the plaintiffs draw is,-that, as Willis must be supposed to have conveyed to some person before March 1802, it is to be presumed it was to Falkener, because, among other reasons, he owed'Falkener, and had no other means of payment but this
 
 *273
 
 land, on the credit of which alone he must have been trusted, except so far as motives of friendship might at times dietate some assistance. Upon an inspection of the accounts, it is seen, that, at the supposed date of the deed, Willis had contracted only the debt to Gloster & Co., and not quite £100 of the amount to the elder Falkener, and about one half of the bonds; making together not quite £300. Now when he made the conveyance, if he did make it, it seems agreed that he had nothing left, and was absolutely insolvent. Why then should the two Falkeners, especially the son, have supplied him with goods and paid debts for him, after that, to the amount of more than £300 Va. money, that is to say, between January, 1797, and July, 1800? At this latter period the dealings stopped short. Why did they not stop, when, by malripg the deed, Willis had paid all he could then pay, or, as was obvious, would ever be able to pay? If the deed was absolute, then there is the extreme improbability, that, without a penny left and with the worst habits, he should have been further trusted for about $1,000. On the other hand, if he mortgaged the land, or, as is more readily conjectured, he appointed Falkener his attorney, or, at his suggestion, appointed Falkener’s correspondents and creditors his attorneys, to sell the land, it is natural that Falkener should have trusted him-. The value of the land was unknown, and there would be an understanding, either that the land should be a security for all advances, or, at any rate,' the money would pass through Falkener’s hands,- and he could indemnify himself. But a still more material consideration, arising out of the accounts, is that there is no credit for the land at any supposed price. It is not pretended that Falkener paid cash for the land. Falkener had none to spare, it seems; and Willis is not known to have received any. Nor is it suggested that there were other debts between these parties except these, and they go back to the beginning of 1793. Consequently, if there was a sale, the price ought to appear in these accounts. But it does not: and its absence, without explanation, most strongly repels other evidence and all idea of an absolute conveyance. It is true, that if the existence of the deed could be clearly established,
 
 *274
 
 there would need no further proof of the consideration, but °f die deed itself But here, the existence and contents of the deed are not directly established, and the dealings of the parties to the supposed instrument form the evidence, or part of the evidence, on
 
 which it is
 
 insisted, that the instrument did exist. And in that point of view, this is the most material part of the case. The bill brings it forward as such, and every one must perceive that it is so. But when it is found that the statement of the bill on this head is a total mistake; that the debts were not paid, but
 
 the
 
 bonds retained by the creditor and the account kept open and without any credit for the land; is not the inference of an absolute deed, from the indebtedness of the bargainor or from any other evidence merely circumstantial, most materially weakened, perhaps entirely rebutted? But further, the interest on each of these debts is computed, as if the whole was due up to September, 1801, and the whole brought into a general statement. From these undoubted facts what presumptions are proper? It cannot be that these debts were satisfied by the land four years before the making of the general statement, as is charged in the bill. Are they not, rather, those before spoken of: either that Falkener was to sell the land or have it sold for Willis and pay himself, or that it should stand as a security for existing and future advances? If Willis had sold, this statement was useless; at
 
 all
 
 events, that part of it, which was made up of the debts that were to be paid by the land, was wrong. But if he had not sold, then it was in the common course of business, that the creditor should let Willis see that he had taken up the worth of the land and could get no more credit on it. Accordingly he received no further supplies. Every one must form the opinion, from the circumstances thus connected with the debts, that the statement was made to effect an adjustment between the creditor and debtor at or after the period of the statement; and, consequently, that there is an insuperable impediment to the belief, that, four years before, there had been a sale of this land in discharge of these very debts, or such part as had then been contracted.
 

 Notwithstanding the conclusion, that seems so necessarily
 
 *275
 
 to follow from the considerations immediately preceding, the circumstance, that the oath of insolvency was taken by Willis, relied on in the bill, was correctly and ably pressed in the argument. This fact is beyond question. Prom it was deduced,
 
 first,
 
 that Willis had, before taking the oath, conveyed the land to some person; and secondly, that he had conveyed to Falkener, because there is no evidence of a conveyance or a dealing with any other person, and there is evidence of some transaction between these persons in respect of the land. We think there is no just reason to think that Willis did convey to any other person, except only the inference resulting from the oath of insolvency, in case it should not appear that he made a deed to Falkener, which is arguing in a circle. The answer,'indeed, states that his widow informed the defendants of- his declaration of an intention to give the land to his daughter. But the declaration itself is not proved; much less that, in conformity to it, he either did convey or said that he had conveyed. On the contrary Mr. Person states that, though intimate with him, he never heard him speak of such a conveyance; but he did say, he had put the lands in the hands of Mr. Falkener S r., to sell for him in Philadelphia, and- for that reason he refused to treat with the witness for the sale. But, though he did not make a deed to his daughter, or any other person, it does not follow that he made one to Mr. Falkener. There is no declaration of Willis that he had conveyed to Falkener, more than any other person. He may have done so, either to Falkener or to another. But there must be evidence of such a conveyance in particular, before the Court can establish it. It is not enough that the former owner disclaimed the land, in the most solemn manner imaginable. Another person can claim only by shewing the existence, in fact, of a conveyance to himself. In itself the oath of insolvency is inconclusive of any such conveyance having been made, and, more particularly, of its having been made to Mr. Falkener. It is indeed a circumstance of very great moment in a chain of circumstances tending to establish a conveyance by the insolvent. But it is inconclusive in several ways. The oath may have been taken corruptly. Though not corrupt, it
 
 *276
 
 may have been false. In either case, the party continued to be the owner. It is acknowledged that neither of these suppositions is to be lightly admitted, for it is both the lair and the legal presumption, that the party did not swear falsely, and especially not wilfully. But if, after such oath, no one can produce a conveyance, nor its existence at any time be legally established, then, however painful or uncharitable, the conclusion cannot be resisted, that the oath was, at the least, not true. It comes back, then, in every case to the enquiry, whether the party, who claims that the insolvent had sold to him, can shew or establish the deed. Here the effort is to do it by circumstantial evidence only. But the force of such .evidence depends on the number, tendency, agreement ,and conclusive nature of the circumstances in themselves, which may be adduced to establish a conclusion, and also on the important fact that there are not opposing circumstances, whose existence cannot be denied, which are inconsistent with that conclusion. In such a case, he, who has the affirmative to maintain, must not expect belief to be yielded, when circumstances are thus irreconcileable. We
 
 will not
 
 venture to say that there w,as no safe or ponveyance to Mr. Falkener. There may have been, and the very assertion of the fact by an honest man will gain a belief in its truth in the mind of one, who knows the claimant. But judicially we cannot proceed on such a ground, but only on competent and sufficient proof. We have already considered a circumstance in this case, which seems to stand opposed to every supposition of an absolute conveyance. We mean the state of the accounts as appearing upon the creditor’s own papers. We cannot assume that Willis intended to give the land to Falkener. Then, if there be
 
 no
 
 evidence of the payment of any price, there was no sale. Consequently there was no conveyance of any sort. But, if there was, it is at least as probable, and more so, that it was a security as that it was absolute: inasmuch as after the conveyance the party conveying was still trusted largely for a time, and that coxild have been upon the credit of this fund only; and further, there never was an adjustment of accounts, as upon a sale, at all events, not before September, 1801, nor, as far as
 
 *277
 
 appears, afterwards. The supposition of such a security being intended, or of an agency to sell, is fatal to this bill, as much so as finding that there was no conveyance of any sort. For the bill proceeds not at all on the footing of a seeurity, but exclusively on that of an absolute deed; and it could do no less, since Mr. Davison and Mr. Johnson, to whom alone Mr. Falkener in any degree explained his claim, state that he said the deed was absolute, and in consideration of the debts to his father. If this account of the consideration appear not to be true, what is the inference? Why that there was no deed, or only a security intended. If the latter was the true character of the tranaction, it furnishes, to a considerable extent, a solution of the difficulty arising out of the oath of insolvency, without imputing to the party corruption or any other impropriety than one, with the habits and in the condition of this unhappy man, migbt have fallen into, without violating or alarming his conscience. Seeing upon the statement of September, 1801, the accumulated debt of £745 12 5, he was probably thoroughly convinced that the land was not worth the sum, and could never pay the debt. Therefore, as he might conceive, substantially he had no interest in the land, and might safely take the oath; especially as it would be natural for Mr. Falkener "at
 
 that
 
 time to agree to take the land in discharge of his debt, as he could get nothing more. But that also would be inconsistent with the bill, which affirms an absolute deed in 1798, or rather in 1797; that is to say, before any communication with Smith and Rodman. It is true, we have nothing from Willis himself that he conveyed by way of security; and if it clearly appeared in any way that he certainly made a conveyance of some sort, his silence as to its being a security would materially repel such a presumption. But it does not thus appear that he did convey at all; and, therefore, the question is, if he did convey, whether he more probably did so absolutely or by way of security. The circumstances arising out of the accounts are in themselves strong to shew that it could not be an absolute deed. As to the silence of Willis respecting the security, it is to be remarked that he was also silent as to having conveyed absolutely;
 
 *278
 
 which, upon the supposition that such a deed was made, is very extraordinary. That a man who had no other property, should not, in the course of five or six years once mention to his friends or family that he had parted with 5,000 acrés of land is very singular. Yet there is no such declaration, although the enquiry is made by the plaintiffs of several witnesses, particularly his brother-in-law, Mr. Park, and his next neighbor, Mr. Person. Indeed the total oblivion, as far as affirmatively appears, into which his mind seems to have sunk upon the subject of this property, whether he retained it entirely, or had conveyed it absolutely, or as a security, denotes such a disregard of matters which interest mankind, as, perhaps, affords more satisfactory evidence of a state of mind not perfectly sound, than the mere opinion of any witness. This circumstance, with the direct evidence upon that point, must leave an impression greatly weakening the influence which the oath of insolvency per
 
 se
 
 might have. It does not appear that at the juncture of taking the oath, Willis was in a situation to prevent the magistrates from administering it. Mr. Mordeeai
 
 thinks he was
 
 at the time both sane and sober; and no one speaks to the contrary at that very juncture. But he also says that Willis was always reckless, and he and Mr. Park and Mr. Person state that he was, for a long time before taking the oath, habitually and excessively intemperate, tending rapidly to insanity, and terminating in it in 1S04, as stated by Mr. Mordeeai; “ for a considerable time, he believes several years, before his death,” as stated by Mr. Park; and “ for three or four years before his death” as stated by Mr. Person. Indeed the last witness is positive he was insane at the time of taking the oath. We cannot expect precise accordance as to dates from the most accurate persons after so long a time. But; from his habits, the opinions of the witnesses taken together, and from the final issue of his reason being overthrown at a subsequent period, not distant from that of taking the oath, we are satisfied that the condition of this man was such as to add another circumstance to those already mentioned
 
 to
 
 detract from the effect, that would naturally follow from taking the oath of insolvency in ordinary cases.
 

 
 *279
 
 We cannot attribute much virtue to the .possession of the patents, in a case presenting the points of doubt hitherto adverted to. Such a possession consists with the supposition of an absolute conveyance, or a security, or a mere agency to sell; for in either case the grants ought to go forward. Therefore this circumstance, like the preceding one, is inconclusive of a sale; and leaves the questions of the character of the conveyance or of its existence, to be determined by
 
 the
 
 other relevant circumstances.
 

 But it is said that the conveyance of the land by the father to the son, and the pledging it by one or both of them to Smith and Rodman, were acts of ownership, which, connected with the claims of ownership, shew that the paper executed by Willis was an absolute deed. It is important, then to ascertain, if it can be ascertained; whether the father did convey this land to his son. If he did not, then all the subsequent claims of the son, however formal, must fall to the ground; since they are put in the bill and rest in fact on the allegation, that these lands are included in the deeds of October, 1798. These deeds are for “ two tracts of land unto me belonging, which are lying or situate in Cumberland or Davidson, in the Western Territory, the particulars whereof I cannot describe, not having their plats nowin my possession.” The argument for the plaintiff is, that Mr. Falkener owned no land in Tennessee, unless he owned this; and therefore he did own this. The conclusion is not logical, for he may have owned neither this nor any other. But admit that he did own two tracts of land in that territory, as stated in the deeds. Yet it is to be determined whether these are the two. In the first place there is no decription shewing an identity between the lands granted and those deeded. It is naturally to be supposed, if these are not the two tracts mentioned in the deeds, that they would also have been mentioned as particularly as the other two; since it is difficult to conceive a more vague description than that of the two tracts found in the deeds. In the next place, the father intended to convey all his property to his son, as is indeed stated in the deeds. Indeed the arguments on the opposite sides agree in this, that Mr. Falkener in October, 1798,
 
 *280
 
 owned but two tracts of land in Tennessee; but they thence ^raw very different conclusions. The plaintiffs say that because he claimed but two tracts, they must be the Willis lands; the defendants say that, for that reason, they could not be the Willis lands, since he owned and claimed two other tracts. For this position the defendants’ counsel relies on the documents coming from Christmas, the Tennessee agentof Falkener. It is nearly certain that Christmas never had the deeds executed by Willis if any such there were, for they were, according to the plaintiffs allegations in Philadelphia, so soon after the period when they must have been executed, that there was not time to send them to Tennessee and back at that day. Besides it could hardly be, that Christmas would have had one deed from Willis proved, and fail to get the other proved also, as it is to be supposed both would be attested by the same witnesses. But this point seems to be placed out of doubt by the account of Christmas of March 1801, and his letter of July 1802. The land on which he paid the taxes must have been those included in the deeds
 
 mentioned
 
 by him, of whichone had been recorded and the othernotfor want of proof; and he asks for the boundaries of “each tract.” Therefore he had two tracts under his care.- Were they these or either of them? It would seem not-, almost to a certainty. For the lands spoken of by Christmas, had, in 1799, been assessed for taxes, which he had paidy and then again next year were assessed for a Federal and State tax, under which he allowed them to be sold to complete the title. The lands thus assessed must have been within what was called the settled parts of the State; for only on lands to which the Indian title was extinguished was a tax of either kind levied. Mr.- Grundy states explicitly that these lands on the Forked Deer were occupied by the Indians until 1818, and were not taxed by the State until 1819, and never by the United States. If this be so, and it seems unquestionable, it would seem that Mr. Falkener owned two other tracts besides these, and, therefore, that he did not own these. If he had, he would have conveyed four instead of two, as mentioned in the deeds. But if the probabilities be equal op opposite
 
 *281
 
 sides of this question; the plaintiffs must yield it, as on them is the
 
 onus.
 

 Besides there is another fact, bearing on this part of the case, deserving of notice. The force of circumstantial evidence depends not only on the consideration, that the facts, on which the presumptions areiounded, are ascertained, but also that nothing is withheld, which, if produced, would shew the facts to be different or authorise an opposite deduction from them. Now it appears from one of the deeds of October 1798, that the assignment then made was not the first for the same purposes. Indeed Smith and Rodman’s letter of April, 1798, shews that Mr. Falkener had addressed a circular to his creditors, proposing terms and advising them of an assignment of some sort. The second deed of October, 1798, explains this by reference to “ an original assignment, dated August 5th, 1797,” whereby the son obliged himself to pay his father’s debts. This was after Willis is said to have conveyed. Where is that original assignment? Why is it withheld, without any account being given of it? That went back nearer to the period of Willis’ deed, if there was one, and may have described the Tennessee lands more particularly. If it did, are we not to suppose the plaintiffs would have produced it, if it would cover the Willis land? On the other hand, if it mentions no land in Tennessee, would there not arise a rational presumption that Willis had not conveyed to Falkener before August, 1797? We repeat that we are not concluding from this positively, that Willis never made such a deed, or that it would so appear from the assignment of 1797. But we must point out the considerations that tend in our judgments to impair the force of the facts relied on for the plaintiffs as circumstantial evidence of that supposed deed; and among them we cannot judicially find that the deeds of October, 1798, do cover the lands granted to Willis, because the description is too vague to identify them, and probably the lands thus described might be other tracts and not these; and this the more especially, because the plaintiffs ancestor had another deed, which almost certainly related to the same subject and would therefore elucidate it, but they do not submit it to our view, nor shew any réason why they
 
 *282
 
 Jo not. Therefore we cannot' see our way to declare that "these are the lands, which the elder Mr. Falkener conveyed to his son by the deeds mentioned in the pleadings.
 

 Supposing however that point to be doubtful on the face of the deeds and on the evidence hitherto discussed, it remains to be considered, whether there are other acts ot the parties calculated to remove the doubts. It is said there are; and that they consist of the claims and endeavors of Mr. Falkener to recover the supposed deeds. With the view of shewing those claims and efforts, the declarations to Davison and Johnson and the correspondence with the several persons, whose letters were read, are relied on. To that extent we incline to think they are evidence, merely as facts which evince enquiry and claim, and not as evidence of the truth of the statements in the letters. The periods of the declarations in question are not distinctly stated. But we presume they must have been subsequent to the application in Philadelphia, because in the conversations with his friends Mr. Falkener said he had sent there to enquire for the deed. When was that? His own letters are not exhibited, except what purports to be a copy of one in 1819. We can therefore collect -the substance of Mr. Falkener’s letters only from those in reply. How do they represent the matter? Can it be inferred'from them that such a paper was ever sent to Smith and Bodman? It does not appear that any papers were ever sent to them, even admitting the contents of the letters to be true, except those carried in May, 1797, by Mr. Macon, then attending Congress in Philadelphia. But there does not appear to have been such a deed among them. The letter, acknowledging the receipt of them, merely speaks of “sundry papers respecting certain tracts of land,” and then declined an agency to make sale ot them. But when that house became willing to lay hold of the land as a security, in consequence of Falkener’s circular in 1798, they then mention the character of the papers; and request him to have “the enclosed powers of attorney (which you sent us last spring) fully acknowledged” and returned to them, to be held as a security for their debts. These reached Mr. Falkener, but it does not appear that he ever returned them to Smith and Hodman.
 
 *283
 
 Probably he did not; for if the land was Willis’s it ought not to have been hypothecated for Falkener’s debts, and if it had been conveyed by Willis to Mr. Falkener, and by him to his son in August, 1797, for the benefit of all his creditors, he ought not and would not have sent to Smith and Rodman powers, which would have amounted to a peculiar security for them. In the absence of evidence it cannot be inferred that those papers ever went out of the possession of Mr. Falkener again. Why are they not produced? Smith and Rod-man’s letters do not mention a deed’from Willis to any person, nor specify by whom the letters of attorney were made. If made by Falkener, it can hardly be doubted they would have been exhibited, if yet in existence; and there is nothing to shew the contrary. If made by Willis, it might be expected they would be kept back, because they would afford a strong implication that he made no deed of conveyance. Indeed in not one of these documents is a deed from Willis mentioned, except in the
 
 certificate
 
 of Willet Smith. In that it appears for the first and the last time. James Smith speaks only of “grants.” - If such a deed had been forwarded by Falkener-with the grants, when he enquired for the latter, would he not also for the former? and if such an enquiry had been made, it cannot be supposed that James Smith would' have taken no notice of it. Yet in the letter of January, 1806, he states that he had found the two patents in a small box, and in that of March following he says, “ agreeably to your request, we now enclose you the patents.” Up to that time it does not appear that an enquiry had been made for. any paper but the grants. How too can we account for the deeds being separated from the patents? No reason can be assigned for taking some of the papers from the others, unless for the purpose of sending some of them home for probate. But we have seen what sort of papers were sent home, powers of attorney and not conveyances. If there had been a deed from Willis to Falkener, why was it not as necessary to have that proved as the letters of attorney from Falkener? We have before seen that there was no reason to suppose that it had been proved. There is, then, nothing upon these papers that can enable us to say, that such
 
 *284
 
 an instrument was sent to Philadelphia, and it is not pretended that there was any paper executed by Willis, that was not sent there. If Willet Smith’s statement was a deposition, it be very unsafe to decree on it. He states that the grants were returned. That was true, but he did not know it, as he lived in New-Jersey and Jas. Smith sent them. He says there was a bill of sale from Willis to Falkener and
 
 a
 
 power of attorney from Falkener, which were not returned; whereas in the letter of April, 1798, with the papers before him, they are called “powers of attorney” and not
 
 a
 
 power, and moreover the powers of attorney were sent to £ alkener, and it does not appear they were afterwards put into the hands of Smith and Hodman.
 

 But there are, we think, seyeral circumstances, which raise fair legal presumptions against the plaintiffs. Among them is the delay of Mr. Falkener to institute proceedings to establish the deed as soon as he dispovered the loss, when in all probability there were witnesses living, who, if there was such a deed, could have given direct evidence of it. It does not appear that Mr. Falkener, the father or son, ever mentioned the name of any person as a subscribing witness to the alleged deed. Why did they not? It is not probable that in 1806, when the grants were sent to him, all cognizant of the matter had died or that he had himself forgotten. Gloster lived several years afterwards, and he could at least have stated whether
 
 he
 
 understood these lands to be those -mentioned in the deeds of October, 1798, and what Willis said when he attested those deeds respecting the lands granted to himself. Yet no enquiry was made of Gloster, nor any
 
 public and open
 
 claim set up to the land by Mr. Falkener, as is stated by the witness Pope, and is to be inferred from the testimony of the witnesses generally. Futhermore it appears that Mr.Macon, who carried the papers to Philadelphia, lived in the same countywith the parties for several years after the present suit was brought, and no attempt was made to get his evidence. It may be that he had forgotten the circumstance, but, in such a case as this, he ought to have been required to state even that. And it is yet more remarkable, if possible, that Willet Smith, who, it is said, had the custody
 
 *285
 
 of the paper lost, and from whose declaration of its loss that fact is sought to be inferred, should have lived to 1839, with his residence known to Mr. Falkener from 1810, and that his testimony to these important facts should not have been taken, if in truth he could have proved them. How can parties expect a court to decree on mere circumstances and many of them not consistent with themselves, while they fail to bring forward direct evidence, so completely and so long in their power?
 

 Upon the whole we must say, that, whatever may have been the real transaction, the plaintiffs have not established by proof, that John Willis executed an absolute deed of conveyance to William Falkener, as alledged in the bill, for the lands in controversy. It would be too much to declare the existence of such an instrument, when its execution is in no manner proved, either by witnesses to it, or by a person saying he had seen it, or even by a single declaration of the supposed bargainor; and when there has been and could be no corresponding possession, besides many other circumstances to render it at least probable, that no such instrument was in fact ever executed.
 

 Per. Curiam, The bill dismissed.